In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-3622 & 04-3623

JOSEPH JASKOLSKI and NATIONAL
INSURANCE CRIME BUREAU,

*Plaintiffs-Appellees*,

*v.*

RICK DANIELS, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:03-CV-479—**Rudy Lozano**, *Judge.*

ARGUED SEPTEMBER 14, 2005—DECIDED OCTOBER 21, 2005

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Joseph Jaskolski assisted
federal prosecutors in an investigation that led to the
indictment of Rick Daniels and three of his relatives for
insurance fraud. After the defendants (collectively
"Daniels") were acquitted, they sued Jaskolski and his
employer, the National Insurance Crime Bureau, in state
court, charging them with the tort of malicious prosecution.
During discovery Daniels sought documents that Jaskolski
deemed to be grand jury materials protected from disclosure
by Fed. R. Crim. P. 6(e). When the state judge sided with
Daniels and ordered Jaskolski to hand over everything

plaintiffs wanted, Jaskolski and the Bureau filed this suit in federal court seeking an injunction. District Judge Lozano obliged and enjoined Daniels from pursuing discovery in state court; instead they must turn to District Judge Moody, who supervised the federal grand jury and under the injunction has exclusive authority to decide which materials in Jaskolski's (and the Bureau's) files will be released to the plaintiffs in the tort litigation.

In this court the parties have devoted their energies to debating whether Jaskolski played the role of "government personnel" in the criminal prosecution—for, if he did, then he "must not disclose a matter occurring before the grand jury". Fed. R. Crim. P. 6(e)(2)(B). Many persons who learn information about a criminal investigation are free to disclose what they know, and "[n]o obligation of secrecy may be imposed except in accordance with Rule 6(e)(2)(B)." That subsection covers, among others, any "person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)." Rule 6(e)(2)(B)(vii). Rule 6(e)(3)(A)(ii) in turn refers to "any government personnel—including those of a state, state subdivision, Indian tribe, or foreign government—that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law".

During the criminal investigation, an Assistant United States Attorney concluded that Jaskolski's assistance was "necessary" and informed Judge Moody that Jaskolski would be allowed access to some grand jury materials. If Jaskolski served the investigation as "government personnel" then he is forbidden to disclose what he learned, without the federal court's approval. One appellate decision holds, however, that investigators who work for the Insurance Crime Bureau are not "government personnel" even if a federal prosecutor supervises their activities. See *United States v. Tager*, 638 F.2d 167 (10th Cir. 1980). Other decisions are more favorable to the idea that private

employees detailed to assist federal prosecutors are "government personnel" for that prosecution. See *United States v. Lartey*, 716 F.2d 955 (2d Cir. 1983); *United States v. Benjamin*, 852 F.2d 413 (9th Cir. 1988). The parties (and the United States, appearing as *amicus curiae*) want us to determine the proper classification of private insurance investigators under Rule 6(e)(3)(A)(ii).

Single-minded attention to the meaning of "government personnel" has led the parties (and the district judge) to slight antecedent questions, such as what this dispute is doing in federal court. State judges manage discovery in state litigation, and if federal law bears on that subject then state judges apply the federal law. Jaskolski alleged that federal jurisdiction exists under 28 U.S.C. §1331, which says that district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." What claim arises under the Constitution, laws, or treaties? Jaskolski does not say. An *issue* depends on federal law, but it is an issue in a pending state case.

Section 1331 does not permit a defendant in state litigation to obtain a federal court's resolution of each federal point that may crop up. Only when a well-pleaded complaint poses a substantial federal issue does §1331 supply jurisdiction. See *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 125 S. Ct. 2363 (2005) (citing many predecessors). Otherwise the existence of a federal defense (or indeed any federal issue, for Rule 6(e) does not supply a "defense" to the claim of malicious prosecution) would allow a new federal suit to be launched. That assuredly is not the law. See, e.g., *Gully v. First National Bank*, 299 U.S. 109 (1936); *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914). Issues that affect discovery but not the substantive claim flunk the well-pleaded-complaint doctrine and so do not come within §1331. What's more, if the presence of a federal issue in a state case permitted a

separate suit under §1331, it also would allow removal under 28 U.S.C. §1441(b), and that too assuredly is not the law. See, e.g., *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 830-32 (2002); *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9-12 (1983); *Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901 (7th Cir. 2004).

Although §1331 does not supply jurisdiction, 18 U.S.C. §3231 does. That's the statute providing jurisdiction over federal criminal prosecutions. Questions about the propriety of releasing grand jury materials for use in other litigation (such as the suit Daniels had filed) come within the federal criminal tribunal's ancillary jurisdiction. See, e.g., *United States v. Baggot*, 463 U.S. 476 (1983); *McDonnell v. United States*, 4 F.3d 1227, 1247-48 (3d Cir. 1993); *American Friends Service Committee v. Webster*, 720 F.2d 29, 71-72 (D.C. Cir. 1983); *Doe v. Rosenberry*, 255 F.2d 118 (2d Cir. 1958) (L. Hand, J.). See also Charles Alan Wright, 1 *Federal Practice & Procedure* §109 (3d ed. 1999). So a dispute of this kind properly may come to federal court—but *only* because of the federal grand jury's role, not (as the parties supposed) because federal courts resolve all disagreements about the application of federal law.

Notice the conditional phraseology: disputes *of this kind* properly *may* be resolved in federal court. Other statutes limit the federal judiciary's role in particular controversies. One of these is the Anti-Injunction Act, 28 U.S.C. §2283: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." Jaskolski requested, and the district court issued, an injunction that stays proceedings in a state court. The district court did not find that any of the statutory exceptions is satisfied; indeed, the court did not mention the statute. On appeal Jaskolski gives it a nod, while Daniels

and the United States ignore §2283. This statute does not affect federal subject-matter jurisdiction, so Daniels has forfeited its benefit. (Because the dispute between Daniels and Jaskolski is private litigation, we need not consider the possibility of abstention under *Younger v. Harris*, 401 U.S. 37 (1971), and its successors, a doctrine that federal courts may need to enforce to protect state sovereignty even if the litigants are sleepwalking. See *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 625-26 (1986); *International College of Surgeons v. Chicago*, 153 F.3d 356, 361 n.4 (7th Cir. 1998).)

Likewise Daniels has forfeited the benefit of issue preclusion (collateral estoppel). The state court already has decided the very issue that these parties presented to the federal judge. Under 28 U.S.C. §1738 the state decision has the same preclusive effect in federal court that it would have in state court. We see no reason why *only* federal courts would be competent to determine whether Jaskolski acted as "government personnel"; certainly federal courts do not have sole authority to determine whether evidence already in Jaskolski's hands represents "matters occurring before the grand jury" (Daniels contends that it is not, and the state judge apparently agreed). At all events, §1738 means that the state law of preclusion must be followed even when federal jurisdiction over a particular subject is exclusive. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373 (1985). Once again, however, the parties have ignored this subject, and as preclusion is an affirmative defense it has been forfeited. We therefore need not explore what preclusive effect an order compelling the production of documents in discovery has under Indiana law.

A reader who expects us to turn at last to the question whether Jaskolski acted as "government personnel" in the investigation will be disappointed, for that issue turns out to be non-dispositive. An affirmative answer would resolve

the dispute in Jaskolski's favor—but a negative answer does not lead to victory for Daniels, so we leave the question for another case in which the resolution matters. Recall the language of Rule 6(e)(2)(B): "[T]he following persons must not disclose a matter occurring before the grand jury: . . . (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii)". Disclosure was made to Jaskolski under Rule 6(e)(3)(A)(ii). Whether the disclosure was made "properly" or "correctly" is neither here nor there. Rule 6(e)(2)(B) asks whether disclosure has been "made under" a particular subsection, not whether the subsection was applied correctly. This protects the prosecutor's (and the witnesses') reliance interests and prevents a blunder from opening the investigatory files.

Daniels contends that it would be "absurd" to read Rule 6(e)(2)(B) to bypass the question whether a given person should have received the grand jury materials now in his possession. He invokes the doctrine that judges avoid giving statutes absurd readings, but he misunderstands its scope. This doctrine does not license courts to improve statutes (or rules) substantively, so that their outcomes accord more closely with judicial beliefs about how matters ought to be resolved. The Supreme Court made this point recently. "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result." *Lamie v. United States Trustee*, 540 U.S. 526, 542 (2004), quoting from *United States v. Granderson*, 511 U.S. 39, 68 (1994) (concurring opinion).

In deciding how to address a subject, the legislature—Rule 6(e) is the work of Congress rather than the Supreme Court under the Rules Enabling Act—must choose between a rule and a standard. Rules such as "determine how the holder came by the information" are easy to administer but are inevitably both too narrow in

some situations (all rules have loopholes) and overbroad in others. Standards such as "determine whether the prosecutor acted in good faith in providing the information, or some other error occurred" could in principle match the outcome more closely to the legislative objective, but standards are difficult to administer and create errors of their own. Courts cannot ascertain intent or good faith without hearings; the principal evidence would be oral and correspondingly difficult to evaluate. Rules have lower administrative costs and will be preferable unless they increase the error costs (the sum of false positives and false negatives) by more than the savings in administrative costs. Whether to choose a rule or a standard is a legislative decision. Judges ought not turn a rule into a standard; that amounts to little more than disagreement with a legislative choice. Boosting the level of generality by attempting to discern and enforce legislative "purposes" or "goals" instead of the enacted language is just a means to turn rules into standards. Cf. *Rodriguez v. United States*, 480 U.S. 522 (1987). Rule 6(e)(2)(B) creates a bright line, and we must enforce it that way.

What Daniels labels "absurd" results are nothing but the rough cuts inevitable with decision by rule. To observe that error costs exist is not to justify use of a standard—first because the choice is for political actors, and second because we cannot be sure that Rule 6(e)(2)(B) as written produces more costs than would a judicial attempt to assess the prosecutor's good faith and the assistant's "government personnel" status one case at a time.

When an opinion says that courts interpret statutes to avoid absurd results, it is not inviting judges to convert rules into standards. *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892), which invoked the norm against absurd outcomes to make the law more in line with the

Justices' substantive preferences, has no modern traction. Today the anti-absurdity canon is linguistic rather than substantive. It deals with texts that don't scan as written and thus need repair work, rather than with statutes that seem poor fits for the task at hand. In other words, the modern decisions draw a line between poor exposition and benighted substantive choice; the latter is left alone, because what judges deem a "correction" or "fix" is from another perspective a deliberate interference with the legislative power to choose what makes for a good rule. Admit the propriety of "fixing mistakes" and you allow a general power to *identify* "mistakes," which means a privilege to make the real substantive decision. Even when the statute *invites* modification, as the "context clause" in some definitions does, judges are limited to considering the linguistic context rather than trying to "improve" the statute's substantive effect. See *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194 (1993).

The only recent decision in which the anti-absurdity canon played an important role, *Green v. Bock Laundry Machine Co.*, 490 U.S. 504 (1989), dealt with an incomplete and baffling rule. Other decisions that cite the doctrine, such as *Public Citizen v. Department of Justice*, 491 U.S. 440 (1989), and *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), use it to avoid an unconstitutional reading. The dearth of modern "substantive absurdity" decisions is readily understandable. Scholars as well as judges have recognized that a power to fix statutes substantively would give the Judicial Branch too much leeway to prefer its views about what makes for "good" laws over those of the Legislative Branch. See, e.g., John Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003); Adrian Vermeule, *Legislative History and the Limits of Judicial Competence: The Untold Story of Holy Trinity Church*, 50 Stan. L. Rev. 1833 (1998). The Supreme Court has been willing to enforce

even statutes that seem to set traps for the unwary or unfortunate. *Dodd v. United States*, 125 S. Ct. 2478 (2005), is a good example: The Court held that the statute of limitations for collateral attacks on criminal convictions may expire before the decision supporting the challenge becomes applicable, and it rejected an argument that this linguistically sound reading should be rejected as substantively absurd.

Another good example is *United States v. Locke*, 471 U.S. 84 (1985), which dealt with a statute that required certain documents to be filed "before December 31." Unwary readers might read this as equivalent to "before the end of the year," and inevitably some did. The Court held that a person who filed *on* December 31 had filed too late. The statute was complete as written, and though the use of "before December 31" rather than "on or before December 31" may have been a blunder there was no linguistic defect, and hence no role for the anti-absurdity canon. The unfortunate outcome for the late filers, the Court held, was just a normal effect of any rule; no matter where the line may be placed, someone always files one day too late. See also *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S. Ct. 2611 (2005).

*Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365 (1990), supplies another example. Curtis Guidry pleaded guilty to embezzling funds from a pension plan of which he had been a trustee. Guidry was himself entitled to a pension from the plan, and the remaining trustees confiscated the value of his pension in partial fulfilment of Guidry's obligation to repay what he stole. Guidry filed suit, contending that this offset violated ERISA's anti-alienation clause. He lost in the court of appeals, which said that an anti-alienation clause is designed to protect pensioners from their own improvident spending, not to enable them to retain ill-got gains. If the enacting Congress had been asked: "Would you make an

exception to the anti-alienation clause for persons who steal from the pension fund?", it likely would have answered yes. This is the method of *Riggs v. Palmer*, 115 N.Y. 506, 22 N.E. 188 (1889), the famous decision holding that to avoid (substantive) absurdity murdering heirs cannot inherit despite the Statute of Wills. Yet the Supreme Court ruled in Guidry's favor. ERISA's anti-alienation clause is coherent as written and contains no exceptions. Whatever Congress *might* have done, it had not done. To the extent that the Justices referred to purposes at all, they conceived them concretely rather than abstractly. What is the purpose of an anti-alienation clause? It is to prevent appeals to the equities case by case. In other words the Justices did not ask, "What is the value served by this particular rule?" Instead they asked "What is the value served by *rules*, in general?" This led the Court to enforce the rule and to rebuff efforts at reconstruction. *Guidry* represents today's interpretive norm.

Our final example is *Lamie*, to which we have referred already. Until 1994 the Bankruptcy Code provided that courts could authorize compensation to the debtor's attorney in Chapter 7 proceedings. In 1994 the vital language—"or to the debtor's attorney"—vanished from 11 U.S.C. §330(a). There was some reason to think that the deletion had been an accidental byproduct of other changes made to this section; the phrase (or an equivalent) probably should have been moved but not eliminated. But it *was* eliminated, the statute as revised could be parsed, and the Court therefore held that the judicial authority to award fees to counsel in Chapter 7 cases had lapsed. The Justices allowed that the change might be unfortunate for some debtors, even counterproductive for the bankruptcy system as a whole, but concluded that such observations must be addressed to the legislature; bad consequences do not allow creative "interpretation" to avoid them. 540 U.S. at 536-37. "Our unwillingness to soften the import of Congress' chosen

words even if we believe the words lead to a harsh outcome is longstanding. It results from 'deference to the supremacy of the legislature'", *id*. at 538, quoting from *Locke*, 471 U.S. at 95.

Rule 6(e)(2)(B) makes sense as written. It parses without the assistance of a red pencil, and judges are not authorized to add words (such as "properly") that would change the Rule's substantive effect.

A few other matters require only brief mention. Daniels contends that an injunction was improvident because Jaskolski did not establish irreparable injury. Yet the point of Rule 6(e)(2)(B) is not to prevent injury to the person making the disclosure; it is to prevent injury to innocent persons whose names may be dragged into the mud, and hindrance of future criminal investigations (because the risk of disclosure will reduce some persons' willingness to cooperate with grand juries). These potential losses are not quantifiable and certainly cannot be redressed by damages paid to Jaskolski, if disclosure turns out to be unwarranted. This is not something that can be proved by testimony in a preliminary-injunction hearing; the district judge did not err in dispensing with one.

Perhaps, as Daniels contends, none of the information the plaintiffs seek in the state litigation is "a matter occurring before the grand jury"—though plaintiffs demanded essentially everything Jaskolski had, including grand jury transcripts, which are covered by Rule 6(e) in his hands even if some disclosures have been made (for example, to Daniels as a defendant in the federal prosecution). Judge Lozano may have written the injunction too broadly to the extent that it halts the entire discovery process in the state litigation pending the sifting before Judge Moody. Yet Daniels's appellate brief does not attempt to show that any category of information sought in the state litigation is independent of the federal grand jury. It would only delay

matters to send the proceeding back to Judge Lozano for a more precise specification of the issues that must be presented to Judge Moody. Prompt resolution by Judge Moody of lingering disputes under federal law—principally, separating the information Jaskolski obtained from the prosecutors and federal investigators (protected by Rule 6(e)) from the information Jaskolski learned on his own as an insurance investigator (not covered by Rule 6(e))—will expedite returning control to the state court, where it belongs.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—10-21-05