In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-3289

IN RE: CRANBERRY GROWERS
COOPERATIVE, doing business as
CranGrow,

*Debtor-Appellee*,

*v.*

APPEAL OF: PATRICK S. LAYNG, United
States Trustee for Western District
of Wisconsin.

Appeal from the United States Bankruptcy Court for the
Western District of Wisconsin.
No. 1:17-bk-13318-cjf — **Catherine J. Furay**, *Chief Bankruptcy Judge*.

ARGUED MAY 17, 2019 — DECIDED JULY 17, 2019

Before RIPPLE, MANION, and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Under 28 U.S.C. § 1930(a)(6), quarterly fees paid by a chapter 11 debtor to the bankruptcy Trustee are based on the debtor's disbursements. Here, the Bankruptcy Court determined that certain payments made by the customers of Cranberry Growers Cooperative

("CranGrow") to its lender should not be considered "disbursements" for purposes of that calculation. Patrick S. Layng, United States Trustee for the Western District of Wisconsin ("Trustee"), appeals that determination. CranGrow agrees with the Bankruptcy Court's interpretation of disbursements, but, for the first time on appeal, maintains that the Bankruptcy Court unconstitutionally applied the recently amended fee schedule in assessing its quarterly fees.

We believe that the language of the fee statute requires that payments made by CranGrow's customers to CranGrow's lender be considered disbursements. We also decline CranGrow's belated invitation to consider the constitutionality of the fee statute. We therefore reverse the Bankruptcy Court's judgment and remand for further proceedings consistent with this opinion.

# I

## BACKGROUND

CranGrow is an unincorporated association that filed for chapter 11 bankruptcy relief on September 25, 2017.[1] At that time, CranGrow owed its bank, CoBank ACB ("CoBank"), roughly $8.1 million on a revolving line of credit.[2]

Shortly after filing for bankruptcy, CranGrow asked the Bankruptcy Court for permission to enter a new borrowing

---

[1] B.R.384 at 1.

[2] B.R.389 at 9 n.1. The parties and the Bankruptcy Court frequently refer to this revolving line of credit as "the revolver."

arrangement with CoBank that would give CranGrow an additional $5 million in credit needed to satisfy various monthly obligations.[3] According to the agreement, CoBank would increase the limit on CranGrow's revolving line of credit to $13.25 million.[4] CoBank would advance funds under the new line of credit so that CranGrow could pay its operating expenses[5] in accordance with a budget that CranGrow regularly submitted to CoBank.[6] In return, CranGrow agreed that all proceeds from its inventory sales would be paid directly to CoBank; these payments first would be used to pay off the existing, prepetition debt of $8.1 million, and then to repay amounts that CoBank extended under the new, postpetition line of credit.[7] Thus, according to this "roll-up" arrangement, postpetition payments would be used to reduce the prepetition debt balance.[8] The financing agreement also provided that the postpetition loan would be given priority over other postpetition administrative expenses.[9] In seeking the Bankruptcy Court's approval for this arrangement, CranGrow represented that it had no other reasonable alternatives for postpetition financ-

---

[3] B.R.10 at 15.

[4] *Id*. at 3.

[5] *Id*. at 5.

[6] B.R.384-2 at 7; *see also id*. at 6 (defining "Budget").

[7] *Id*. at 6.

[8] B.R.10 at 16.

[9] B.R.384-2 at 5.

ing.[10] Although the Trustee objected to the roll-up request,[11] the Bankruptcy Court approved the financing arrangement.

After the agreement was signed, CranGrow's customers made payments to CoBank, and these payments were applied daily, as they were received, to reduce CranGrow's prepetition debt to CoBank.[12] The payments did not result in an automatic extension of postpetition credit to CranGrow in the amount of the payments. Instead, CoBank extended funds for operating expenses to CranGrow on a weekly basis[13] according to the budget that had been submitted to, and approved by, CoBank.[14]

On December 19, 2017, CranGrow proposed a chapter 11 reorganization plan. The Bankruptcy Court confirmed the plan on February 16, 2018, and it became effective on April 27, 2018. During this time, CranGrow made the required quarterly fee payments to the Trustee. As already noted, § 1930(a)(6) of Title 28 of the United States Code provides that fees are to be calculated based on the amount of the debtor's disbursements during the preceding quarter. In calculating its quarterly fees, CranGrow did not include as disbursements the amount that CranGrow's customers paid

---

[10] B.R.10 at 17.

[11] B.R.67 at 6.

[12] *See, e.g.*, B.R.137 at 4.

[13] B.R.401 at 18.

[14] B.R.384-2 at 7.

directly to CoBank.[15] CranGrow took the position that the collection of accounts receivable was not a disbursement because "[w]hen collected, accounts receivable sweep to pay down the revolver …, and then the revolver is borrowed against to remit disbursements."[16]

The Trustee disagreed with this characterization. He maintained that, because the customers' payments were being used to reduce CranGrow's prepetition indebtedness, they should be considered disbursements.[17] When CranGrow continued to calculate and pay its quarterly fees without including its customers' payments to CoBank, the Trustee sent CranGrow a delinquency notice. CranGrow objected and asked the Bankruptcy Court to interpret the term disbursement to exclude the receivable payments to CoBank on the ground that the "funds were never seen by CranGrow or deposited in any way into a debtor-in-possession account."[18] In the alternative, it asked the Bankruptcy Court to waive the fees.[19]

In a written opinion, the Bankruptcy Court held that the customer payments to CoBank were not disbursements. It acknowledged that "[m]ost courts turn to the 'plain meaning' of 'disbursement' and define it expansively to include

---

[15] *See, e.g.*, B.R. 137 at 2.

[16] *Id*.

[17] B.R.384-3 at 2.

[18] B.R.323 at 4.

[19] *Id*. at 17–18.

any transfer of funds of the estate—regardless of the method of transfer."[20] The court further acknowledged that "[m]ost often, payments on revolving lines of credit are considered disbursements."[21] Nevertheless, even though CranGrow's arrangement with CoBank "appear[ed] on the surface" to be similar to cases in which payments to creditors had been considered disbursements, the Bankruptcy Court concluded that the substance of the arrangements requires a different result:

> The deposit of funds into CranGrow's account was not governed by a formula that determined the amount of available credit. Rather, all of the collected accounts receivable minus fees and interest were deposited into Debtor's account. This flow of funds into the Debtor's account was viewed by the parties as a cash management system. There was a continual flow of dollars against the prepetition debt converting it to immediately available funds as postpetition debt. While expenditure of the funds is limited by a budget, there was a symmetry between amounts credited against the prepetition line of credit balance and the amounts drawn on the postpetition line of credit.[22]

---

[20] B.R.389 at 3.

[21] *Id*. at 4.

[22] *Id*. at 5.

The Bankruptcy Court also believed that the Trustee's authorities were distinguishable

> because the funds at issue here—as a matter of substance—never settle debt. The cases cited by the [Trustee] involve funds permanently leaving the estate, whether through payment of operating expenses, prepayment of a loan, satisfaction of a mortgage through selling land, or reduction of line of credit indebtedness for periods of time. Here, the funds at issue—cash collateral—were returned to CranGrow immediately. It paid interest and fees from those funds before the money was deposited in its account. To the extent there was no reduction in the total revolver indebtedness, there was no real change in the underlying economic circumstances. CoBank merely received accounts receivable, subtracted fees and expenses, and returned the remainder to CranGrow. Analyzing the economic realities yields the conclusion these funds functionally belonged to CranGrow the entire time and were thus not "paid out" or "expended" in the traditional sense of "disbursement."[23]

Instead, the Bankruptcy Court likened CranGrow's arrangement to that employed in *In re HSSI*, 176 B.R. 809 (Bankr. N.D. Ill. 1995), *rev'd*, 193 B.R. 851 (N.D. Ill. 1996). In

---

[23] *Id*. at 9–10.

that case, subsidiary debtors deposited proceeds from some of their sales into "a pooled account. Pooled funds were used to make payments to a postpetition lender on an out-standing loan. Payments from the pooled account to repay the loan were disbursements, but payments from the single accounts to the pooled accounts were *not* disbursements."[24] According to the Bankruptcy Court, CranGrow's roll-up arrangement

> contain[ed] elements of a cash management system and transfers like that in *HSSI*. First, the DIP Revolver Loan document refers to the set-up as a "cash management arrangement," revealing the parties' intent. Second, funds are merely "recycled" through CoBank, who serves only as a conduit between revenue and expenses, since funds are immediately readvanced and deposited into Debtor's account.[25]

Finally, the court was concerned with "double dip[ping]" by the Trustee.[26] The court explained that, given that farming is seasonal, "CranGrow operates at break-even or a loss for much of the year," during which times

> CranGrow is cash-poor. Its prepetition revolver exhausted, it needed the availability of over-advances from the DIP Revolver Loan. In fact,

---

[24] *Id*. at 11 (citations omitted).

[25] *Id*.

[26]  *Id*. at 12.

the Revolver draw/repayment is projected to be identical to the net negative cash flow until about the fourth quarter of 2018. The negative cash flow also includes the [United States Trustee] quarterly fee. Since it is cash flow negative and draws additional funds to pay UST fees, CranGrow incurs UST fees on fees if applying accounts receivables to the prepetition debt and then immediately converting it to a post-petition debt re-advance counts as two separate disbursements. This in effect represents a fee on a fee, or a form of double tax, resulting in an unfair cycle and snowball effect for much of the year.[27]

According to the Bankruptcy Court, "the [Bankruptcy] Code aims to provide debtors with a 'fresh start.'"[28] Including "revolver" transactions as disbursements would have "a 'severe impact' on the ability of debtors, including CranGrow, to obtain a 'fresh start' and effectively reorganize."[29] In sum, the Bankruptcy Court concluded that treating the revolver payments as disbursements "harms the viability of CranGrow moving forward,"[30] and, generally, "does not

---

[27] *Id.*

[28] *Id.* at 13 (quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

[29] *Id.* at 14.

[30] *Id.*

further the underlying purposes of section 1930(a)(6)."[31] Consequently, the Bankruptcy Court denied the Trustee's petition for fees.[32] The Trustee petitioned to file a direct appeal to this court, which we granted.[33]

## II

## DISCUSSION

### A.

Section 1930(a) of Title 28 of the United States Code requires debtors to pay fees into the United States Trustee System Fund to support the operations of the bankruptcy courts. During the pendency of their bankruptcy cases, chapter 11 debtors are required to pay quarterly fees to the Trustee based on the amount of disbursements made by the bankruptcy estate. *See* 28 U.S.C. § 1930(a)(6). These range from $325 per quarter for debtors whose disbursements are $15,000 or less to $30,000 per quarter for debtors whose disbursements total more than $30,000,000. *See id.*

---

[31] *Id*. at 15.

[32] The practical effect of the Bankruptcy Court's decision is illustrated by a chart in CranGrow's brief. *See* Appellee's Br. 15. If customer payments were included as disbursements in the calculation of quarterly fees, CranGrow's fees for 2018 would have increased from $199,925.64 to $402,872.31.

[33] The Bankruptcy Court had jurisdiction over CranGrow's chapter 11 bankruptcy case pursuant to 28 U.S.C. §§ 157(a) and (b), and 1334(a). Our jurisdiction is secure under 28 U.S.C. § 158(d)(2).

In 2017, Congress enacted a temporary amendment to 28 U.S.C. § 1930(a)(6) that significantly increases the fees for debtors whose quarterly disbursements are $1,000,000 or more; it provides:

> During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B).

Here, the parties dispute the meaning of the term "disbursement."[34] Because "disbursement" is not defined in the Bankruptcy Code, we employ the ordinary meaning of the term. *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (employing the ordinary meaning of the term "applicable" because the term is not defined in the Bankruptcy Code). The dictionary definition of "disbursement" is "[m]oney paid out; expenditure." The American Heritage Dictionary of the English Language (5th ed. 2018). In applying this term, courts have concluded that it is an "expansive term." *Tighe v. Celebrity Home Entm't, Inc. (In re Celebrity Home Entm't, Inc.*), 210 F.3d 995, 998 (9th Cir. 2000) (internal

---

[34] We review the Bankruptcy Court's interpretation of the statute, specifically the meaning of disbursement under 28 U.S.C. § 1930(a), de novo. *See Wittman v. Koenig*, 831 F.3d 416, 419 (7th Cir. 2016).

quotation marks omitted).[35] It includes payments "made in the ordinary course of business," *Walton v. Jamko, Inc. (In re Jamko, Inc.)*, 240 F.3d 1312, 1316 (11th Cir. 2001), whether made to secured or unsecured creditors, *see St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1534 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995). Moreover, disbursements include "[p]ayments made on behalf of a debtor, whether made directly or indirectly," *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 422 (3d Cir. 2005); *see also St. Angelo*, 38 F.3d at 1534–35, as well as payments made on revolving lines of credit, *see In re Fabricators Supply, Inc.*, 292 B.R. 531, 534 (Bankr. D.N.J. 2003); *United States Trustee v. Wernerstruck, Inc. (In re Wernerstruck, Inc.)*, 130 B.R. 86, 89 (D.S.D. 1991). Indeed, the Bankruptcy Court acknowledged that "[t]he great weight of case law broadly defines 'disbursements,'" and the majority view considers direct payments to revolving lines of credit to be disbursements.[36]

Based on this definition, the payments made by CranGrow's customers to CoBank were disbursements. They were funds "paid out" to one of CranGrow's creditors on behalf of CranGrow. Indeed, the customer payments here closely resemble those in *In re Fabricators Supply*, in which

---

[35] *See also Robiner v. Danny's Mkts., Inc. (In re Danny's Mkts., Inc.)*, 266 F.3d 523, 526 (6th Cir. 2001) ("We are unable to escape the conclusion that … Congress contemplated that disbursements will encompass all payments to third parties directly attributable to the existence of the bankruptcy proceeding … .").

[36] B.R.389 at 15.

the court concluded that such payments constituted disbursements. In that case, after filing for chapter 11 protection, Fabricators entered into a postpetition loan agreement for a $2.5 million revolving line of credit with Fleet Capital. *In re Fabricators Supply*, 292 B.R. at 532. At the time that the postpetition financing agreement was authorized by the court, Fabricators owed Fleet approximately $1.8 million. *Id*. The agreement "direct[ed] Fabricators to remit to Fleet all cash collateral, and further authoriz[ed] Fleet to apply the funds collected to the outstanding balance owed." *Id*. Pursuant to the agreement, Fabricators deposited all accounts receivable and other proceeds into an account that Fleet maintained. *Id*. Fabricators described this account for receivables as "blocked" because "Fleet ha[d] sole control over this account, and Fabricators [could ]not withdraw any money from the account." *Id*. at 532–33 (internal quotation marks omitted). Fleet swept the monies from the blocked account on a daily basis. *Id*. at 533. Fabricators maintained a separate, operating account with Fleet from which it paid vendors and other expenses. *Id*. The operating account was funded by monies transferred from the blocked account based on the available credit on the revolving loan. *Id*.

Fabricators maintained that Fleet's sweeps of the blocked account should not be considered disbursements for purposes of § 1930(a)(6). It characterized its agreement with Fleet "as creating a continuous flow of dollars against its credit line such that no disbursement occurs when Fleet sweeps the blocked account." *Id*. Instead, it maintained "that disbursements only occur[red] when it ma[de] payments from its operating account." *Id*. The bankruptcy court, however, disagreed. It held that Fleet's daily sweeps of the blocked account were disbursements for purposes of calculating the

quarterly fees. It noted first that the term "disbursements" had to be given its "ordinary, contemporary common meaning." *Id*. (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). It further observed that two courts of appeals, after surveying various possible definitions, had concluded that "disbursement simply means … 'to expend' or 'to pay out.'" *Id*. (quoting *Cash Cow Servs. of Fla., LLC v. United States Trustee (In re Cash Cow Servs. of Fla., LLC)*, 296 F.3d 1261, 1263 (11th Cir. 2002); *St. Angelo*, 38 F.3d at 1534). The court in *Fabricators* then concluded that

> it is readily apparent that the process by which Fabricators deposits its accounts receivable into the blocked account and Fleet then sweeps that account results in disbursements to Fleet on which the quarterly fees should be calculated. Fabricators' contention that it cannot be charged with a disbursement from the blocked account because it exercises no control over the account is totally without merit. The blocked account and the sweep of that account is simply the payment mechanism to which Fabricators agreed when it entered into the Loan Agreement with Fleet. The accounts receivable deposited by Fabricators into the blocked account certainly constitute debtor funds, and the sweep of the account by Fleet certainly constitutes an "action or fact of disbursing" … .

*Id*. at 534. The court in *Fabricators* disagreed with the characterization "that there [wa]s no economic substance to the sweeps by Fleet because the amount of the debt owed by Fabricators [wa]s essentially the same before and after the

sweeps occur as a result of the revolving nature of the loan." *Id*. It explained that "the revolving nature of the Line of Credit is precisely what results in the disbursement when the blocked account is swept. During the term of the Line of Credit, Fabricators actually engages in a series of borrowing transactions which are repaid by the sweeps of the blocked account." *Id*.

Just as Fleet's sweep of Fabricators' blocked account constituted a disbursement, so too do payments by CranGrow's customers to CoBank. In both scenarios, customer payments are being used to pay down the debtor's revolving line of credit. In CranGrow's case, however, the disbursement was simply more direct: the customers were not depositing their payments into an account that was being swept, but were sending their payments directly to CranGrow's creditor.

CranGrow submits that there are critical differences between the situation in *Fabricators* and the one before us, and, therefore, *Fabricators* should not guide our analysis. These distinctions, however, are either illusory or immaterial. For instance, CranGrow submits that, according to the agreement in *Fabricators*, Fleet would make the funds available to the debtor based on a "lending formula," *id*. at 532, whereas here, once funds were received from CranGrow's customers, they became immediately available to CranGrow through the postpetition line of credit.[37] However, the amount of funds that CoBank made available to CranGrow was based

---

[37] *See* Appellant's Br. 33.

on a budget submitted to, and approved by, CoBank.[38] And, as CranGrow's counsel acknowledged at oral argument, the extension of credit was not automatic; the receipt of a customer payment by CoBank and the extension of credit to CranGrow were "two separate transactions."[39]

Finally, CranGrow states that, "[u]nlike CranGrow," "Fabricators held a depository account with its lender" and "funds actually left Fabricators' bank account through a sweep by the lender."[40] CranGrow fails to explain why, for purposes of determining whether a disbursement has been made, it is material that CoBank is not a depository institution. Nor does it explain why it is material that customer payments did not make a momentary stopover in a depository account before being swept by the creditor. In both situations, funds that belonged to the debtor (customer receivables) were being paid to a creditor and, therefore, constituted disbursements.

---

[38] *See* B.R.401 at 17–19 (counsel for CranGrow recalling that "the advanced funds by CoBank were supplied based on the budget, and the budget had to be pre-approved on a weekly basis by CoBank" and also noting that "the amount of the advances were tied, in some mathematical way, to … the assets of the debtor and the anticipated receivables of the debtor as well").

[39] Oral Argument at 32:26. Similarly, CranGrow asserts that the extension of credit in *Fabricators* only involved postpetition debt. *See* Appellee's Br. 33. However, in *Fabricators*, the court recounted that, at the time it authorized the postpetition financing, "Fabricators owed Fleet approximately $1.8 million." *In re Fabricators Supply, Inc.*, 292 B.R. 531, 532 (Bankr. D.N.J. 2003).

[40] Appellee's Br. 33.

Indeed, CranGrow "concedes that a majority of courts expansively define 'disbursements,' in a way that almost always favors the U.S. Trustee."[41] It argues, however, that we should take a different approach for a number of reasons. First, it surmises that courts historically have taken a broad view of disbursements because, until recently, the fees were relatively small.[42] But a broad view of "disbursements" was well established when Congress increased the fees in 2017. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). When Congress enacted the increased fee schedule in 2017, it could have narrowed the courts' definition of disbursements, but it refrained from doing so.[43]

---

[41] *Id*. at 28.

[42] The chart in CranGrow's brief illustrates the difference in fees resulting from the change in law. *See supra* note 32; Appellee's Br. 15. The chart reveals that, employing CranGrow's definition of disbursements, its 2018 quarterly fees would have totaled $46,800 under the old law. *See* Appellee's Br. 15. This amount increases to $199,925.64 under the new law. *Id*. The total fees increase to $402,872.31 when the payments on the revolver are included. *Id.*

[43] Moreover, 28 U.S.C. § 1930(a)(6)(A) has one express exception; it provides that "[e]xcept as provided in subparagraph (B), … a quarterly fee shall be paid to the United States trustee." Section 1930(a)(6)(B) provides for increased quarterly fees in fiscal years 2018 through 2022 for debtors with quarterly disbursements of at least $1,000,000. Congress did not set forth any other exceptions in subsection (a)(6) and, specifically, did not except any kind of payment from the term "disbursements." "The gen-

Additionally, CranGrow asserts that giving "disburse-ments" a broad reading creates absurd results. We have ex-plained, however, that the absurdity doctrine is not a license to "make the law 'better,'" *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 642 (7th Cir. 2012); rather, it deals with texts that do not make sense as written "and thus need re-pair work, rather than with statutes that seem poor fits for the task at hand." *Jaskolski v. Daniels*, 427 F.3d 456, 462 (7th Cir. 2005). Here, a broad reading of disbursements does not render the statute nonsensical.

In sum, "disbursements" has been interpreted broadly to mean all payments by or on behalf of the debtor. The pay-ments by CranGrow's customers to CoBank were payments made on behalf of CranGrow and resulted in the reduction of CranGrow's prepetition debt. The customer payments therefore are disbursements for purposes of § 1930(a)(6) and should have been included in the calculation of CranGrow's quarterly fees.

## B.

CranGrow argues that, even if it owes quarterly fees based on the payments to CoBank, those fees should be

---

( … continued)

eral rule of statutory construction is that the enumeration of specific ex-clusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *Cash Currency Exch., Inc. v. Shine (In re Cash Currency Exch., Inc.)*, 762 F.2d 542, 552 (7th Cir. 1985). This canon of construction counsels against a judicially created exception to disbursements.

waived. It submits that a waiver is permitted by 28 U.S.C. § 1930(f)(3). Section 1930(f)(3) provides: "This subsection does not restrict the district court or the bankruptcy court from waiving, in accordance with Judicial Conference policy, fees prescribed under this section for other debtors and creditors." The Bankruptcy Court did not address this argument because it determined that additional fees were not owed.

Critically, CranGrow does not come forward with any authority, from our court or any other, that approves the waiver of quarterly fees. Additionally, CranGrow has not come forward with a Judicial Conference policy stating that quarterly fees generally may be waived or that a waiver in the circumstances presented here might be appropriate. Indeed, the Judicial Conference policies with respect to the waiver of fees do not mention quarterly fees. *See* 4 Administrative Office of the United States Courts, Guide to Judiciary Policy § 820 (Apr. 10, 2018).[44] Consequently, there is no basis for a waiver of quarterly fees under § 1930(f)(3).

---

[44] CranGrow has included in its appellate materials a recent report of the Judicial Conference's Committee on the Administration of the Bankruptcy System, in which the Committee "noted the following issues with interpreting the relevant statutes: (1) whether certain payments constitute 'disbursements' for purposes of calculating the quarterly fee (specifically payments made by a chapter 11 debtor to its post-petition lender in connection with a revolving line of credit) … ." *See* Appellee's Supp. App. 42 & n.3. After noting these issues, the Report states that "[t]he Committee will further consider these issues and consider whether the Conference should make a recommendation to Congress regarding whether to reenact revised subsection (a)(6)(B)." *Id*. at 42. Thus, the Committee has not made any policy recommendations, but simply is in the process of discussing these issues. Additionally, the Report's summary advises that

## C.

CranGrow submits, for the first time on appeal, that, in applying the amended fee schedule of § 1930(a)(6)(B), the Bankruptcy Court violated the uniformity requirement of the Bankruptcy Clause of Article 1, section 8 of the United States Constitution. Specifically, because the new fee schedule was not implemented nationwide until October 2018, some debtors, like CranGrow, were subjected to the increased fees whereas other debtors were not. This nonuniformity, CranGrow asserts, violates Article 1, section 8.[45]

The Trustee, however, maintains that CranGrow's constitutional challenge is untimely. He submits that CranGrow had a full and fair opportunity to raise this issue before the Bankruptcy Court, but failed to do so. Consequently, it has forfeited the constitutional argument. We agree with the Trustee.

---

( … continued)

"no recommendations presented herein represent the policy of the Judicial Conference unless approved by the Conference itself." *Id*. at 22 (capitalization removed). Thus, the Report itself confirms that it is not the type of definitive Judicial Conference action necessary to undergird a § 1930(f)(3) waiver of fees.

[45] Article 1, section 8 of the United States Constitution provides, in relevant part, that "The Congress shall have Power … To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States."

**1**.

To understand CranGrow's uniformity argument, and why it is untimely, some background on the U.S. Trustee system is helpful. Congress initially instituted the Trustee system as a pilot program in select districts. After the trial period, Congress implemented it nationwide in 1986, with a temporary exception for districts in Alabama and North Carolina. Those districts initially were required to opt in by 1992. Eventually, however, this opt-in requirement was removed altogether.[46] In those districts, the functions of the Trustee are performed by Bankruptcy Administrators, who are employees of the Judicial Branch. When enacted, the Trustee system was to be funded primarily through user fees. Because the districts in Alabama and North Carolina did not employ a Trustee, Trustee fees were not imposed in those districts.[47]

The disparity in the fees assessed by these separate systems came to the fore in *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995). In *St. Angelo*, the debtor argued that "because the U.S. Trustee program—and the fee system which supports it—ha[d] not been implemented in Alabama and North Carolina, the law governing the fee system [wa]s not uniform and there-

---

[46] *See* Derek F. Meek & Ellen C. Rains, *Applicability of USTP Guidelines to Bankruptcy Administrators*, 33 Am. Bankr. Inst. J., Nov. 2014, at 16.

[47] *See* Dan J. Schulman, *The Constitution, Interest Groups, and the Requirements of Uniformity: The United States Trustee and the Bankruptcy Administrator Programs*, 74 Neb. L. Rev. 91, 129–31 (1995).

fore must be struck down in its entirety." *Id*. at 1529. The Trustee defended the dual system on two grounds. The first was that Congress implemented the two systems "in order to study the effect of the U.S. Trustee system upon the administration of bankruptcy proceedings." *Id*. The court noted, however, that there was no support for this proposition. *Id*. Second, the Trustee submitted "that the U.S. Trustee program serves a purely administrative function and therefore is not constrained by the requirements of the Uniformity Clause." *Id*. at 1530. The court rejected this argument as well, stating:

> The statute clearly … falls within the scope of the Uniformity Clause. The U.S. Trustees have assumed the supervisory roles of the bankruptcy judges. Indeed, the statute entrusts U.S. Trustees with extensive discretion to appoint interim and successor trustees, monitor and supervise bankruptcy proceedings, examine debtors, advise the bankruptcy courts, and even, in some circumstances, to seek dismissal of cases. Thus, the U.S. Trustees' activities have a direct effect upon the rights and liabilities of both debtors and creditors.

> The U.S. Trustee program is not only intimately connected to the government's regulation of the *relationship* between creditor and debtor, it also has a concrete effect upon the *relief* available to creditors. Because debtors in states other than North Carolina and Alabama must pay higher fees for the supervision of bankruptcy proceedings, the current system

> reduces the amount of funds that the debtor
> can ultimately pay to his creditors in the other
> 48 states.

*St. Angelo*, 38 F.3d at 1530–31 (citations omitted).

Turning to the remedy for the constitutional violation, the Ninth Circuit struck down "the 1990 amendments to 28 U.S.C. § 1930," which continued the Bankruptcy Administrator program in the six districts in Alabama and North Carolina. *Id*. at 1533. According to the court, it was this provision "that guarantee[d] that creditors and debtors in the 48 other states are governed by a[] dissimilar, more costly bankruptcy system than members of the same groups in Alabama and North Carolina." *Id*.

After *St. Angelo*, Congress amended 28 U.S.C. § 1930 to allow the Judicial Conference of the United States to impose in non-trustee districts fees equal to those imposed in trustee districts. *See* 28 U.S.C. § 1930(a)(7).[48] With the adoption of § 1930(a)(6)(B) in 2017, however, the disparity re-emerged. By statute, the increase in fees for chapter 11 debtors in trustee districts became effective January 1, 2018, and applied to

---

[48] 28 U.S.C. § 1930(a)(7) provides:

> In districts that are not part of a United States trustee region as defined in section 581 of this title, the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection. Such fees shall be deposited as offsetting receipts to the fund established under section 1931 of this title and shall remain available until expended.

debtors then in bankruptcy as well as those who filed after the effective date. The Judicial Conference did not adopt the same fee schedule for the bankruptcy-administrator districts until September 2018. When it did so, it made the new fee schedule effective as of October 1, 2018, and did not apply the new schedule to debtors already in bankruptcy. *See* Administrative Office of the United States Courts, Report of the Proceedings of the Judicial Conference of the United States 11 (Sept. 13, 2018).

**2.**

Based on *St. Angelo*,[49] CranGrow maintains that the Judicial Conference's failure to institute the new fee schedule for

---

[49] In addition to *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1529–33 (9th Cir. 1994), *amended*, 46 F.3d 969 (9th Cir. 1995), CranGrow's position finds support in a recent decision from the bankruptcy court in the Western District of Texas. *See In re Buffets, LLC*, 597 B.R. 588 (Bankr. W.D. Tex. 2019). In *Buffets*, the bankruptcy court determined that the Judicial Conference's decision to apply the new fee schedule in bankruptcy-administrator districts

> remedies the amendment's violation of the Uniformity Clause for future cases, but not in this case. Like the lack of uniformity that originally existed between the two programs, the gap in time between the imposition of the quarterly fees in [trustee] districts and [bankruptcy-administrator] districts is problematic. …
>
> The Bankruptcy Judgeship Act of 2017 violated the Constitution when it increased quarterly fees only in the UST program. "Under any standard of review, when Congress provides no justification for enacting a non-uniform law, its decision can only be considered to

bankruptcy-administrator districts on the same timeline as trustee districts violates the Uniformity Clause. The Trustee, however, contends that this constitutional issue is not properly before us. He asserts that CranGrow had a full and fair opportunity to raise this issue before the Bankruptcy Court, but failed to do so. For its part, CranGrow explains that the Judicial Conference Report, which reflects the decision to apply the new fee schedule prospectively beginning in October 2018, was not issued until September 13, 2018. At that point, the fee issue was fully briefed before the Bankruptcy Court; in fact, the Bankruptcy Court ruled on the Trustee's claim only eight days after the Conference Report was issued. Thus, CranGrow submits, it did not have a meaningful opportunity to raise the constitutional issue between the time that the Judicial Conference acted and the time that the Bankruptcy Court ruled on the Trustee's claim.

CranGrow's assertion that it knew about the constitutional issue only a few days before the Bankruptcy Court ruled, however, only partially rings true. At oral argument, counsel for CranGrow admitted that it was aware of the

---

( … continued)

> be irrational and arbitrary." *St. Angelo*, 38 F.3d at 1532. While the quarterly fees now apply in BA districts from October 1, 2018, forward, the increased fees ostensibly owed by the Reorganized Debtors during the first three quarters of 2018 violate the Uniformity Clause. Therefore, the Reorganized Debtors are not required to pay the $ 250,000 in fees for the first three quarters of 2018, but rather the uniform quarterly fee of $ 30,000.

*In re Buffets*, 597 B.R. at 594–95.

*St. Angelo* case and of a potential constitutional problem much earlier.[50] Counsel simply assumed that the Judicial Conference would act to cure the fee disparity.[51]

CranGrow further submits that, even if it had an opportunity to raise the constitutional argument and failed to do so, we nevertheless have the discretion to address issues raised for the first time on appeal. *See Kaczmarek v. Rednour*,

---

[50] Oral Argument at 20:36–21:45 (counsel for CranGrow acknowledging that "[i]t's possible that [CranGrow] could have known there was a problem" even before the Bankruptcy Court handed down its decision and agreeing with the court that counsel relied on the fact that, when the Judicial Conference acted with respect to the bankruptcy-administrator districts, the Conference would correct the nonuniformity).

[51] Counsel also noted that it is not apparent from the language of § 1930(a)(7) that the Judicial Conference had to take the affirmative step of re-voting to increase fees in bankruptcy-administrator districts every time that there is a change to the schedule in § 1930(a)(6). The plain language of § 1930(a)(7) is permissive, not mandatory, *see id*. (stating that "the Judicial Conference of the United States *may* require the debtor in a case under Chapter 11 of title 11 to pay fees equal to those imposed by paragraph (6) of this subsection" (emphasis added)), allowing the Judicial Conference to implement fee increases commensurate with § 1930(a)(6) as it deems appropriate. Nevertheless, the 2001 report of the meeting at which the Judicial Conference implemented § 1930(a)(7) suggests that the Judicial Conference may have intended for its one-time vote to encompass all future fee increases. *See* Administrative Office of the United States Courts, Reports of the Proceedings of the Judicial Conference of the United States 46 (Mar. 14, 2001) ("To implement this statute, the Conference approved a Bankruptcy Committee recommendation that such fees be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time.").

627 F.3d 586, 595 (7th Cir. 2010). "In our adversary system, … we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). We operate on "the premise that the parties know what is best for them[] and are responsible for advancing the facts and arguments entitling them to relief." *Id.* at 244 (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)). Thus, although we have the discretion to determine "what questions may be taken up and resolved for the first time on appeal," *Singleton v. Wulff*, 428 U.S. 106, 121 (1976), we exercise that discretion "sparingly," *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015). Indeed, we usually only do so when "failure to present a ground to the district court has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note," *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993).

We believe it would be particularly inappropriate to entertain CranGrow's constitutional challenge under the circumstances presented here. First, *St. Angelo* made litigants—including CranGrow—generally aware that constitutional problems would arise if bankruptcy fees were imposed in trustee, but not bankruptcy-administrator, districts. When Congress amended § 1930(a)(6) in late 2017, that problem arose. CranGrow began paying nonuniform fees early in 2018 and began litigating the calculation of those fees in mid-2018. Nevertheless, despite the potential constitutional issue, CranGrow kept silent. Indeed, even when the Judicial Conference did not cure fully the nonuniformity—and the constitutional problem became concrete—CranGrow did not

bring the issue before the Bankruptcy Court. Instead, it was the bankruptcy judge who mentioned the constitutional problem for the first time in her certification for direct review.[52] CranGrow had the opportunity to raise the constitutional issue before the Bankruptcy Court, but simply failed to do so. Second, the Trustee has been denied the opportunity to address the issue; the Bankruptcy Court has been denied the opportunity to weigh on the issue; and we have been denied the benefit of a full vetting on an issue of constitutional dimension. Finally, in raising the issue of lack of uniformity, CranGrow is attempting to enlarge its rights, specifically, to recover fees already paid to the Trustee.[53] Given all of these factors—CranGrow's opportunity to raise the issue before the Bankruptcy Court, the harm to the Trustee and to the court system, and CranGrow's effort to en-

---

[52] Our grant of the petition for direct review of the Bankruptcy Court's order, which addresses only the issue whether the direct customer payments to CoBank are disbursements, cannot be read as permission to raise issues on appeal that were not argued and disposed of by the Bankruptcy Court.

[53] As previously noted, *see supra* p.9 & note 32, the Bankruptcy Court held that CranGrow properly excluded payments made by its customers to CoBank from the calculation of its quarterly fees. Excluding those payments from the calculation of the quarterly fees saved CranGrow approximately $200,000 over the course of 2018. *See supra* note 42; Appellee's Br. 15. However, if we were to hold that the new fee schedule had been applied in an unconstitutional manner to CranGrow, CranGrow would be able to recoup an additional $150,000 in fees.

large its rights despite its prior silence—we decline to entertain CranGrow's constitutional challenges.[54]

## Conclusion

For the foregoing reasons, we hold that the payments of CranGrow's customers to CoBank constituted disbursements, which should have been included in the calculation of quarterly fees paid to the Trustee. We also decline to reach CranGrow's constitutional challenges to the assessment of fees. The judgment of the Bankruptcy Court is reversed, and the action is remanded to the Bankruptcy Court for further proceedings consistent with this opinion. The Trustee may recover the costs of this appeal.

REVERSED and REMANDED

---

[54] CranGrow also attacks the quarterly fee payment as an unconstitutional user fee. *See* Appellee's Br. 20–21. This argument was apparent and available to CranGrow during the pendency of its case before the Bankruptcy Court, but CranGrow simply failed to raise it. We therefore will not entertain it on appeal. *See, e.g., Bank of Am., N.A. v. Veluchamy (In re Veluchamy)*, 879 F.3d 808, 821 (7th Cir. 2018) ("It is well established that a party waives the right to argue an issue on appeal if he failed to raise that issue before the lower court.").