In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 19-2111 & 19-2123

INTL FCSTONE FINANCIAL INC.

*Plaintiff-Appellee,*

*v.*

DAVE JACOBSON, *et al.,*

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 19-cv-01438 and 19-cv-01629 — **Joan H. Lefkow**, *Judge.*

———————————

ARGUED DECEMBER 13, 2019 — DECIDED FEBRUARY 24, 2020

———————————

Before MANION, KANNE, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Investors in commodities futures appeal an order to arbitrate their trading disputes. But they stumble out of the blocks: our review is limited to "final decisions of the district courts." 28 U.S.C. § 1291. Here, the district court ordered arbitration and designated an arbitration forum, then stayed the case to address related issues, including the arbitration venue. Put more simply, the district court made non-final decisions.

Although statutory exceptions exist to the rule of finality, none apply here. Because this case remained open to resolve certain issues, we dismiss defendants' appeal for lack of jurisdiction.

**I**

Defendants, commodities futures investors, maintained trading accounts with INTL FCStone Financial Inc. ("FCStone"), a clearing firm which handled the confirmation, settlement, and delivery of transactions. In November 2018, extraordinary volatility in the natural gas market wiped out defendants' account balances with FCStone, leaving some defendants in debt. Lawsuits followed: defendants alleged Commodity Exchange Act violations against FCStone; FCStone sought payment from defendants with negative balances.

Defendants drew first blood. They launched arbitration proceedings against FCStone before the Financial Industry Regulatory Authority ("FINRA"). FCStone responded with a declaratory judgment action claiming the parties must arbitrate their disputes before the National Futures Association ("NFA"),[1] and that FINRA lacks jurisdiction over the underlying disputes.

---

[1] The NFA is a self-regulatory organization and a "registered futures association" under the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq. Belom v. Nat'l Futures Ass'n*, 284 F.3d 795, 797 (7th Cir. 2002). An association cannot be registered as a futures association under the Commodity Exchange Act unless its rules "'provide a fair, equitable, and expeditious procedure through arbitration or otherwise for the settlement of customers' claims and grievances.'" *Id*. (quoting 7 U.S.C. § 21(b)(10)).

The district court ruled for FCStone. To understand that decision and its impact on our jurisdiction, first we must untangle the parties' district court arguments about the proper arbitration forum.

FCStone argued that arbitration agreements and federal regulations bind defendants to proceed before the NFA. When defendants opened their futures accounts with FCStone, they signed arbitration agreements that said:

> Any controversy or claim arising out of or relating to your accounts shall be settled by arbitration, either (1) under the Code of Arbitration of the National Futures Association, or (2) upon the contract market on which the disputed transaction was executed or could have been executed. … At the time you notify … [FCStone] … of your intent to submit a claim to arbitration, … you will have an opportunity to elect a qualified forum for conducting the proceedings, and will be supplied with a list of qualified organizations.

FCStone reads this provision to limit account disputes to arbitral forums operated by the NFA or the contract market on which the disputed transaction was executed (here, the Chicago Mercantile Exchange). Because the agreements do not provide FINRA arbitration as an option, FCStone argued, defendants have no purported rights to arbitrate before FINRA.

Next, FCStone claimed that Commodity Futures Trading Commission ("CFTC") regulations preclude FINRA arbitration. *See* 7 U.S.C. § 2(a)(1)(A) (establishing CFTC jurisdiction

over "accounts, agreements … and transactions involving … contracts of sale of a commodity for future delivery"). FCStone pointed to 17 C.F.R. § 166.5 and reasoned that the CFTC adopted that provision to govern arbitration agreements over CFTC-regulated disputes. *See* 17 C.F.R. § 166.5(b)–(c) (allowing futures investors to enter binding predispute arbitration agreements with CFTC registrants, so long as they are voluntary and not a condition to opening an account). FCStone submits that investors entering into such agreements must abide by § 166.5 for selecting an arbitration forum, which they summarize in a four-step process:

- <u>Step 1</u>: investor provides the CFTC registrant with notice of intent to arbitrate;

- <u>Step 2</u>: registrant provides the investor a list of three qualified arbitration organizations and the applicable rules for each arbitral option;

- <u>Step 3</u>: investor must select one of the three arbitral options offered within 45 days;

- <u>Step 4</u>: if the investor fails to select one of the three arbitral options offered within 45 days, the registrant has the exclusive right to select one of the arbitral options.

*See id*. § 166.5(c)(5).

FCStone believes defendants must follow these steps for two reasons. First, FCStone provided services to defendants exclusively out of its futures commission merchant division, which provides services only in connection with futures and

options traded on futures exchanges.[2] Second, that division is registered with and regulated by the CFTC.

Defendants disregarded "Step 1," however, and filed for FINRA arbitration, alleging FCStone violated 7 U.S.C. § 13c of the Commodity Exchange Act.[3] After learning about defendants' FINRA filings, FCStone prompted defendants about their obligations under the arbitration agreements and § 166.5. FCStone also stressed that, like the parties' agreements, § 166.5 neither mentions nor contemplates FINRA as an arbitration forum over disputes. In keeping with "Step 2," FCStone sent defendants a list of three forums to arbitrate their disputes: the NFA, the Chicago Mercantile Exchange, and AAA's commercial arbitration forum. Defendants rejected all three. Despite this rejection, FCStone waited 45 days, allowing defendants a chance to comply with "Step 3." By the end of that timeframe, no defendants had selected any of the arbitration forums offered by FCStone. So, invoking "Step 4," FCStone initiated arbitration proceedings before the NFA.

Not surprisingly, defendants refused NFA arbitration. FCStone responded with a complaint for declaratory and injunctive relief. After several FCStone customers not named in

---

[2] The Commodity Exchange Act requires that futures contracts be sold through commodity exchanges and the futures commission merchants registered on those exchanges. *Nagel v. ADM Inv'r Servs., Inc.*, 217 F.3d 436, 439 (7th Cir. 2000) (citing 7 U.S.C. § 6(a)). Futures commission merchants operate in the commodity industry akin to the securities industry's broker-dealers. *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 662 (7th Cir. 2013).

[3] Section 13c imposes liability for "[a]ny person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of" a Commodity Exchange Act violation. 7 U.S.C. § 13c(a)–(b).

that suit tried to initiate FINRA arbitration, FCStone amended its complaint to join them. The amended complaint also added a count under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, to compel arbitration. At the same time, FCStone moved to compel defendants to NFA arbitration and requested the entry of "a declaratory judgment to the effect that FINRA is not a valid arbitration forum for the parties' dispute, and NFA is the valid forum for this dispute."

Defendants disagreed with FCStone's claims and insisted the parties must arbitrate their disputes before FINRA. Why? Because separate from its futures commission merchant division, FCStone also maintains a securities brokerage division registered with and regulated by FINRA and the Securities and Exchange Commission ("SEC").

To understand defendants' position, some background about FINRA helps:

> FINRA is a private, non-profit corporation that is registered with the [SEC] as a "national securities association." Such private regulation was made possible by the Maloney Act, which provided for the establishment of self-regulatory organizations to oversee the securities markets. 15 U.S.C. §§ 78o *et seq.* In this capacity FINRA creates and enforces rules that govern the industry alongside the SEC and is subject to significant SEC oversight. The SEC must approve all of FINRA's rules, 15 U.S.C. § 78s(b)(1), and the SEC may abrogate, add to, and delete from all FINRA rules as it deems necessary. 15 U.S.C. § 78s(c).

*Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013).

Federal securities laws generally require firms that deal in securities to comply with FINRA rules. *Id*. Defendants pointed to FINRA Rule 12200, which requires FINRA members to submit to FINRA arbitration when requested by "a customer … in connection with the business activities of the member." Because FCStone provided services to defendants, and it is a FINRA member through its securities brokerage division, defendants claimed to be customers within the meaning of FINRA Rule 12200.[4] FCStone countered defendant's position with these undisputed facts:

- Defendants' account agreements did not authorize FCStone to trade in securities products.

- FCStone's futures commission merchant division—which managed defendants' accounts—does not provide securities brokerage services and is not regulated by FINRA or the SEC.

- FCStone's securities brokerage division provided no services to, and did not enter into any transactions with, defendants.

- FCStone's securities brokerage division is wholly distinct from its futures commission merchant division: the products within each division are different; the treasury, account onboarding, and operations departments of each division are different; the divisions have

---

[4] FINRA does not define "customer," except to say that a "customer shall not include a broker or dealer." FINRA Rule 12100(k).

> different compliance officers and compliance staff; the divisions have different controllers and accounting staff; and each division's records are kept separate.

Undeterred, defendants argued that FINRA—which regulates the securities industry, not commodity futures markets—is the appropriate forum to arbitrate their commodities-based claims.[5] Defendants also argued that the arbitration agreements neither waive FINRA arbitration nor supersede FINRA Rule 12200; even if they did, defendants claimed FINRA Rule 2268(d)(1) prohibits such waivers.[6] To top things off, defendants claimed FCStone repudiated the arbitration agreements. According to defendants' version of events, FCStone offered "AAA arbitration" and then refused to cooperate once defendants chose to arbitrate there. This "inequitable conduct," defendants argued, amounted to a breach and repudiation of the arbitration agreements.

Unlike FCStone, defendants did not move to compel FINRA arbitration. But they did oppose FCStone's arbitration, injunction, and declaratory relief request. Defendants also moved to dismiss FCStone's amended complaint and

---

[5] FINRA's publications explain "[t]he Commodity Futures Trading Commission (CFTC) is the federal government agency that regulates the commodity futures, commodity options, and swaps trading markets. Anyone who trades futures with the public or gives advice about futures trading must be registered with the National Futures Association (NFA), the independent regulator for anyone who trades futures with the public." FINRA, *Commodity Futures*, https://www.finra.org/investors/learn-to-invest/types-investments/commodity-futures (last visited February 4, 2020).

[6] FINRA Rule 2268(d)(1) provides that "[n]o predispute arbitration agreement shall include any condition that … limits or contradicts the rules of any self-regulatory organization."

tacked on a sanctions motion against FCStone for seeking "anti-arbitration injunctive relief."

We turn now to the district court's order. The court faced a fork in the road: on the question of arbitration forum, did the parties' arbitration agreements or FINRA Rule 12200 govern? The district court took on the latter (and more intricate) inquiry, analyzing whether the parties' disputes fell within FINRA's regulatory ambit. After careful analysis the court answered "no" and held "defendants agreed to arbitrate their disputes at the NFA and that FINRA Rule 12200 does not apply to the underlying commodity futures and options accounts and transactions here." In so holding, the district court concluded it did not need to address whether the arbitration agreements superseded or waived defendants' claims for FINRA arbitration.

The district court also held:

- Defendants are not "customers" within the meaning of FINRA Rule 12200.

- The parties have no agreement to arbitrate disputes before FINRA.

- FINRA lacks jurisdiction over the underlying disputes.

- All defendants (except one) entered into a valid and enforceable arbitration agreement with FCStone.

- Because defendants either rejected or failed to choose a qualified arbitral forum under the arbitration agreements within 45 days, FCStone properly chose the NFA.

- The NFA is the proper arbitral forum for the underlying disputes under the arbitration agreements.

In addition to these rulings, the district court rejected defendants' contention that FCStone breached and repudiated the arbitration agreements. The court found that after § 166.5's 45-day notice period expired, some defendants sent FCStone a letter "agreeing" to arbitrate at AAA's consumer arbitration forum. But AAA's *consumer* forum was not one of the three arbitral options offered by FCStone. FCStone offered arbitration only before the NFA, the Chicago Mercantile Exchange, and AAA's *commercial* arbitration forum. So not only did those defendants "agree" to the wrong AAA forum, they did so too late. On that basis, the district court concluded that defendants either "expressly rejected AAA in favor of FINRA," selected AAA "after the [§ 166.5] deadline passed," or never demanded arbitration before AAA.[7]

Consistent with these rulings, the district court denied defendants' motions and directed defendants to submit their disputes to the NFA; it also denied FCStone's motion for a preliminary injunction without prejudice. The district court

---

[7] As part of its ruling, the district court noted: "Unless FCStone provided context that did not find its way into the record here, FCStone's representation … that it did not agree to arbitrate … at the AAA appears misleading." We take no position on whether the district court should correct this sentence in its order. If it decides to, the record reflects: (1) FCStone's complaint and first amended complaint identify AAA "under its Commercial Arbitration Rules" as the forum offered; and (2) both complaints attached AAA's commercial arbitration rules as exhibits. *See* FED. R. CIV. P. 60(a) (allowing district courts on motion or on their own to correct a mistake arising from oversight or omission whenever one is found in an order or other part of the record).

then scheduled a status conference to take place the day after defendants' deadline to submit their claims to the NFA.

Defendants appealed before the next court conference. The district court responded by staying the case, but did not explain the terms or purpose of the stay. Since issuing the stay, the district court has concluded that defendants' appeal divested the court of its jurisdiction to decide unresolved issues related to its arbitration order. Those issues include arbitration venue, grounds for a permanent injunction, the time needed for defendants to comply with the arbitration order, and attorneys' fees.

## II

Defendants ask us to reverse the district court and order the parties to arbitrate before FINRA. Our review begins and ends with jurisdiction. First, we consider appellate jurisdiction, then we address the district court's jurisdiction to complete its work notwithstanding defendants' attempted appeal.

## A

Section 1291 of the Judicial Code grants courts of appeals jurisdiction over "all final decisions of the district courts of the United States." 28 U.S.C. § 1291. A decision is final if it "ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 86 (2000). A decision is not final "[s]o long as the matter remains open, unfinished or inconclusive." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). The finality requirement reflects "the general rule … that the whole case and every matter in controversy in it must be decided in a single appeal." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1712 (2017) (citation and internal brackets

omitted). It also "preserves the proper balance between trial and appellate courts, minimizes the harassment and delay that would result from repeated interlocutory appeals, and promotes the efficient administration of justice." *Id*.

Like § 1291, the FAA authorizes appellate jurisdiction over "a final decision with respect to an arbitration." 9 U.S.C. § 16(a)(3). And, just as 28 U.S.C. § 1292(a)(1) permits interlocutory appeals of orders granting injunctions, the FAA contains a statutory exception to the final decision rule for "an interlocutory order granting … an *injunction against an arbitration*." 9 U.S.C. § 16(a)(2) (emphasis added). Defendants argue § 16(a)(2), § 16(a)(3), and § 1292(a)(1) confer jurisdiction here. Their arguments fall into two categories: jurisdiction due to an injunction, and jurisdiction due to a final decision.

Defendants contend the district court issued an "anti-arbitration injunction," so jurisdiction exists under § 16(a)(2) and § 1292(a)(1). But the opposite occurred—the district court *denied* FCStone's request for a preliminary injunction halting FINRA arbitrations.

To sidestep the absence of an express injunction, defendants imply an injunction, which they predicate on their first-in-time FINRA filing and the "liberal federal policy" embodied in the FAA "favoring arbitration." Br. of Defendants-Appellants 30, ECF No. 25, quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Defendants argue the FAA commands FINRA arbitration rather than NFA arbitration. By forcing defendants to proceed before the NFA, they argue, the district court "effectively enjoined" pending FINRA arbitrations, which "amounted to an anti-arbitration injunction." For us to hold otherwise, defendants protest,

would "invert[] the basic purpose of the FAA." These arguments fail for three reasons.

*First reason*. To construe the district court's order as an injunction, defendants ask us to do something we cannot: place a law's purpose above its text. "We as judges of the U.S. Court of Appeals have only the power to interpret the law; it is the duty of the legislative branch to make the law." *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1270 (7th Cir. 1993). To substitute text with purpose, as defendants' argument requires, would have us assume a legislative role and overstep our limited authority. *See, e.g., Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 237–38, 238 n.5 (2007) (admonishing that "[a]ppellate courts must take … jurisdictional prescription seriously" and that courts impermissibly "assume the legislative role" by suppressing a statute to extend jurisdiction). We must "follow the text even if doing so will supposedly undercut a basic objective of the statute." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) (citation and internal quotation marks omitted); *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 270 (2010) ("It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve."). To that end, we do not "speculate upon congressional motives" when attempting to discern the meaning of a statutory text, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008), because we "assum[e] that the ordinary meaning of that [text] accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). *Cf. W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991) ("The best evidence of [statutory] purpose is the statutory text adopted by both Houses of Congress and submitted to the President."), *superseded by*

*statute* as stated in *Landgraf v. USI Film Products*, 511 U.S. 244, 251 (1994).

We do not suggest a statute's purpose lacks any analytical function. *See, e.g.*, ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 20 (2012) ("The evident purpose of what a text seeks to achieve is an essential element of context that gives meaning to words."); *see also id.* at 56–58 ("[W]ords are given meaning by their context, and context includes the purpose of the text."). But that function is always limited by, and subordinated to, the text of the law under review. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Plain text trumps purpose. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 460 (2012) ("[P]etitioners' purposive argument simply cannot overcome the force of the plain text."); *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text."). And when the text is clear, "there is no need to … consult" its purpose. *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004). For these reasons, the FAA's purpose cannot be used to contradict, supplement, or suppress its text, as defendants seek.

Defendants also construe the FAA's purpose too broadly when they reduce it to "encouraging arbitration." The Supreme Court "ha[s] said on numerous occasions that the central or primary purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks and citations omitted). Put another way, the FAA "is a congressional

declaration of a liberal federal policy favoring arbitration *agreements*," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24 (emphasis added), not merely arbitration. *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019) ("Congress adopted the Arbitration Act in an effort to … establish a liberal federal policy favoring arbitration agreements."); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("We have described [9 U.S.C. § 2] as reflecting both a liberal federal policy favoring arbitration … and the fundamental principle that arbitration is a matter of contract." (internal citations and quotation marks omitted)).

All this takes us back to the text of the FAA. Section 2 provides that "[a] written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (citing 9 U.S.C. §§ 2, 4) ("[T]he [FAA] mandates enforcement of valid arbitration agreements."). And § 4 says "[a] party aggrieved by the alleged … refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court … for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4; *see also Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 692 (7th Cir. 2004) ("The FAA makes arbitration agreements enforceable to the same extent as other contracts, so courts must enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." (internal quotation marks and citations omitted)).

Here, defendants concede "[t]he parties indisputably agreed to arbitrate" disputes through the arbitration

agreements. Br. of Defendants-Appellants 5, 15, 20, ECF No. 25. The district court directed arbitration before the NFA under § 4 of the FAA for the same reason. So, contrary to defendants' position, the district court neither issued an anti-arbitration injunction nor defied the FAA's purpose. Instead, the court issued an order to arbitrate under the terms of arbitration agreements that defendants entered voluntarily. That is a pro-arbitration decision, and that is what § 2 and § 4 of the FAA require. As for § 16(a)(2), it applies only when an "injunction against arbitration" exists. 9 U.S.C. § 16(a)(2). Because defendants cannot make that showing, they lack jurisdiction under that statute.

*Second reason*. "A pro-arbitration decision, coupled with a stay (rather than a dismissal) of the suit, is not appealable." *Moglia v. Pac. Employers Ins. Co. of N. Am.*, 547 F.3d 835, 837 (7th Cir. 2008) (citing *Green Tree Fin. Corp.*, 531 U.S. at 87 n.2 (holding same)). Indeed, in *Moglia* we held "9 U.S.C. § 16(b) positively *forbids* appeal." *Id*. (emphasis in original). Section 16(b) says "an appeal may not be taken" from an order staying litigation in favor of arbitration "[e]xcept as otherwise provided in [§] 1292(b)," which allows an appeal of controlling questions by joint permission of the district and appellate courts. *Moglia*, 547 F.3d at 837. Here, defendants appeal a pro-arbitration decision in a stayed lawsuit without a § 1292(b) certification. Yet defendants did not request to certify their appeal, and seven months have passed since the date of the contested order. *See Richardson Elecs., Ltd. v. Panache Broad. of Pa., Inc.*, 202 F.3d 957, 958 (7th Cir. 2000) (holding a two-month delay in making § 1292(b) request "was sufficient grounds for us to refuse our permission to appeal" and that "a district judge should not grant an inexcusably dilatory

request"). Therefore, defendants present the same type of appeal considered—and rejected—in *Moglia*.

*Third reason*. Section 16(b) of the FAA supersedes § 1292(a)(1) for orders to arbitrate. *Moglia*, 547 F.3d at 837. Section 16(b)(2) says: "Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order … directing arbitration to proceed under section 4 of this title." As for § 1292(a)(1), it generally grants jurisdiction to courts of appeals over "[i]nterlocutory orders of the district courts of the United States … granting … injunctions." "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Relevant here, the Sixth Circuit has explained:

> Section 1292(a) generally provides for immediate appeals of injunctions, while § 16 specifically forecloses appeals of pro-arbitration interlocutory orders. We know that § 16 is the more specific provision because it directly addresses the issue—arbitration-related appeals—and because its exception for § 1292(b) shows that the statute reflects (and limits) the pre-existing rules for appeals. *See* 9 U.S.C. § 16(b). That means "[o]ther possible sources of appellate jurisdiction, including … § 1291 (final decisions in civil suits), *and § 1292(a) (injunctions)*, are superseded for orders to arbitrate." *Moglia*, 547 F.3d at 837[.]
>
> . . . .
>
> . . . If our § 1292(a) appellate jurisdiction over injunctions remained unaffected by § 16, even

the most clumsy litigants could delay an arbi-
tration and drive up costs with procedural fenc-
ing. All they would have to do is ask for an
injunction—*any* injunction—other than one en-
joining the arbitration itself. The district court
would have to rule on it. And any denial would
invoke our jurisdiction by the terms of § 1292(a).
… Congress deserves more credit than to have
created such a two-faced regime—carefully re-
stricting appeals from arbitration decisions in
one direction, then indulging all manner of ap-
peals in the other.

*Preferred Care of Del., Inc. v. Estate of Hopkins by and through
Hopkins*, 845 F.3d 765, 769–70 (6th Cir. 2017). We agree with
the Sixth Circuit's reasoning and hold that the more specific
appellate-review provisions of § 16(b) control over
§ 1292(a)(1), which is a general statute governing appellate ju-
risdiction. Because defendants lack a § 1292(b) certificate from
the district court, § 1292(a)(1) offers them no help here.

Defendants also contend § 16(a)(3) of the FAA, which
grants appellate jurisdiction over "a final decision," gives
them a jurisdictional foothold. We disagree. The district court
kept the lawsuit open to address arbitration-related issues, in-
cluding arbitration venue and whether grounds existed to
grant a permanent injunction. We cannot conclude the district
court left "nothing more for the court to do but execute the
judgment," *Green Tree Fin. Corp.* 531 U.S. at 86, as needed to
qualify the arbitration order as a final decision.

In addition to the final decision requirement, Rule 58 of
the Federal Rules of Civil Procedure instructs that "[e]very
judgment … must be set out in a separate document." Indeed,

in a declaratory judgment action like this one, we have instructed that "Rule 58 … says that the judgment must appear on a separate piece of paper—separate, that is, from the court's opinion. We take this requirement seriously." *Alpine State Bank v. Ohio Cas. Ins. Co.*, 941 F.2d 554, 558 (7th Cir. 1991) (citations omitted); *see also Wisconsin Cent. Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 854 (7th Cir. 2018) ("Rule 58's 'separate document' requirement is important because it keeps jurisdictional lines clear."). Here, the record contains no judgment separate from the district court's order. So we take this opportunity to remind bench and bar that if a judgment is intended to be issued pursuant to Rule 58, a court "must declare specifically and separately the respective rights of the parties, not simply state in a memorandum opinion, minute order, or a form prescribed for judgment in a civil case that a motion has been granted or denied." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 651 (7th Cir. 2016) (quoting *Alpine State Bank*, 941 F.2d at 558).

Without a final decision, § 16(a)(3) of the FAA does not offer a path to appellate jurisdiction. To hold otherwise in this case would "undermine[] efficient judicial administration and encroach[] upon the prerogatives of district court judges, who play a *special role* in managing ongoing litigation." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (emphasis added) (citations and internal quotation marks omitted). That "special role" segues to our next issue.

**B**

District courts are not helpless in the face of premature appeals. True, the filing of a notice of appeal generally confers jurisdiction with the court of appeals and divests the district court of jurisdiction over certain related matters. *See Griggs v.*

*Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). But we have explained this rule has several qualifications, "perhaps the foremost of which is that an appeal taken from an inter-locutory decision does not prevent the district court from finishing its work and rendering a final decision." *Wis. Mut. Ins. v. United States*, 441 F.3d 502, 504 (7th Cir. 2006) (citations omitted). This allowance extends to "appeals from orders that are non-final because of the district court's oversight." *Id*. (citation omitted). In *Wisconsin Mut. Ins.*, we held that premature notices of appeal did not oust the district court of its "jurisdiction [to] patch[] up the judgment to allow appellate review." *Id*. at 505. That holding applies here.

The filing of a notice of appeal does not automatically divest a district court's jurisdiction in all respects, as the district court here cautiously presumed. "Jurisdiction is not a unitary concept. … The distribution of authority to decide depends on practical rather than formal considerations." *Apostol v. Gallion*, 870 F.2d 1335, 1337 (7th Cir. 1989). The considerations in *Griggs*—preventing conflict among tribunals and the waste of time and money if the district court changes a judgment after an appeal has been briefed—"are not implicated by allowing the district court to enter a proper final decision and thus permit a pending appeal to go forward." *Wis. Mut. Ins.*, 441 F.3d at 504–05. Nor does the rule specified in *Griggs* operate when there is a purported appeal from a non-appealable order. *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 860 n.7 (7th Cir. 2013) (citations omitted); *see also* 16A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3949.1 (5th ed. 2019) ("The weight of authority holds that an appeal from a clearly non-appealable order fails to oust district court authority."). Because defendants here attempted to appeal a non-appealable arbitration order, the

district court's jurisdiction over arbitration-related issues re-mained intact.

One final issue: The district court did not decide whether the parties' arbitration agreements relinquished defendants' purported rights to FINRA arbitration. This threshold question is best left for the district court to decide. *See Cranberry Growers Coop. v. Layng*, 930 F.3d 844, 857 (7th Cir. 2019) (explaining that we "sparingly" resolve questions for the first time on appeal). Although we express no opinion on the merits of this issue, among the circuits that have, the obligation to arbitrate under FINRA Rule 12200 can be superseded or waived by specific agreement of the parties.[8] Rule 54 of the Federal Rules of Civil Procedure allows the district court to fully address the waiver and superseding contract questions. FED. R. CIV. P. 54(b) (permitting a district court to revisit its interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities").

---

[8] *See, e.g.*, *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 90, 102-03 (3d Cir. 2018) (analyzing the construction of a contract's forum-selection clause—not an arbitration clause—and whether it operated to waive a customer's right to arbitrate under FINRA Rule 12200); *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) ("As a threshold matter, … a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules."); *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 328 (4th Cir. 2013) ("[T]he obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties."); *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 132 (2d Cir. 2011) ("[D]ifferent or additional contractual arrangements for arbitration can supersede the rights conferred on a customer by virtue of a broker's membership in a self-regulating organization such as FINRA." (internal brackets omitted)).

**III**

Because the arbitration and declaratory judgment order was not a final decision, we lack jurisdiction over defendants' appeal, so this appeal is DISMISSED.